**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SHERIE LEMIRE, Individually and as personal representative for the Estate of Robert St. Jovite; Gerard Charles St. Jovite and Nicole St. Jovite; NICOLE ST. JOVITE; GERARD CHARLES ST. JOVITE; ESTATE OF ROBERT ST. JOVITE,
*Plaintiffs-Appellants*,

v.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION; ARNOLD SCHWARZENEGGER, Individually and in his official capacity as Governor of the State of California; JAMES E. TILTON, Individually and in his official capacity as Secretary of CA Department of Corrections and Rehabilitation; TOM L. CARY, Individually and in his official capacity as Warden of CSP-Solano; D. K. SISTO, Individually and in his official capacity as Warden of CSP-Solano; CAHOON, Individually and in her official capacity as Correctional Officer; ALCARAZ, Individually and in his official

No. 11-15475

D.C. No.
2:08-cv-00455-GEB-EFB

OPINION

capacity as Correctional Officer; WADE, Individually and in his official capacity as Correctional Officer; ORRICK, Individually and in her official capacity as Correctional Officer; MARTINEZ, Individually and in her official capacity as Correctional Officer; GORDON WONG, Individually and in his official capacity; HAK, MTA, Individually and in her official capacity; ALVARA C. TRAQUINA, M.D., Individually and in his official capacity as Chief Medical Officer/Health Care Manager; NORIEGA, Individually and in his official capacity; DUSAY, DR., Individually and in his official capacity; NEURING, Individually and in his official capacity; DODIE HICKS, Senior RN; C. HOLLIDAY, Correctional Officer, Badge No. 70808; JAIME CHUA, Correctional Officer, Badge No. 55696,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Eastern District of California
Garland E. Burrell, District Judge, Presiding

Argued and Submitted
May 15, 2012—San Francisco, California

Filed August 7, 2013

Before: Stephen Reinhardt, Richard R. Clifton, and
N. Randy Smith, Circuit Judges.

Opinion by Judge Clifton

## SUMMARY[*]

### Prisoner Civil Rights

The panel affirmed in part and vacated in part the district court's summary judgment and remanded in an action arising from the apparent suicide of an inmate in the California prison system.

The panel held that the district court erred in granting summary judgment with respect to plaintiffs' claims that defendants Warden Dennis Sisto and Captain James Neuhring impermissibly convened a staff meeting that resulted in the absence of all floor officers from the building where the inmate was incarcerated for a period of as long as three and a half hours because those claims presented triable issues of fact. The panel held that a jury could conclude, on the basis of the factual record before the district court, that the complete withdrawal of all supervision created an

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

unconstitutional risk of harm to the mentally ill inmates, that Sisto and Neuhring were responsible for, and deliberately indifferent to, this lack of supervision and that the lack of floor staff was an actual and proximate cause of the inmate's death. The panel affirmed, however, the grant of summary judgment on the inadequate staffing claim with respect to defendants Lieutenant Gordon Wong, Sergeant Gale Martinez, and Sergeant Cheryl Orrick.

The panel also held that the district court erred in granting summary judgment with respect to plaintiffs' claims based on the failure to administer CPR by defendants Officer Rebecca Cahoon and Officer Chris Holliday. The panel concluded that there was a triable issue of fact as to whether defendants Cahoon and Holliday were deliberately indifferent to the inmate's potentially serious medical need when they first arrived at his cell. The panel affirmed with respect to plaintiffs' claims for failure to provide proper medical treatment with respect to the remaining defendants. The panel also affirmed with respect to the failure to train claims.

## COUNSEL

Geri Lynn Green, Attorney, San Francisco, California, for Plaintiffs-Appellants.

Kamala D. Harris, Attorney General of California, Jonathan L. Wolff, Senior Assistant Attorney General, Thomas S. Patterson, Supervising Deputy Attorney General, Diana Esquivel (argued), Deputy Attorney General, Sacramento, California, for Defendants-Appellees.

**OPINION**

CLIFTON, Circuit Judge:

This action under 42 U.S.C. § 1983 arises from the apparent suicide of an inmate in the California prison system, Robert St. Jovite. The estate, parents, and daughter of the deceased prisoner seek to recover damages for alleged violations of the Eighth Amendment, based on St. Jovite's right to be free from cruel and unusual punishment, and the Fourteenth Amendment, based on the family's substantive due process right of familial association. These claims are predicated on allegations that members of the custodial, medical, and supervisory staff at California State Prison at Solano ("CSP-Solano") failed to protect and provide adequate medical care by failing to (1) ensure the presence of floor officers to provide sufficient supervision of the inmates, (2) administer CPR immediately after St. Jovite was found unconscious in his cell, and (3) sufficiently train the prison staff in proper CPR procedure. The district court granted summary judgment to Defendants on all claims.

We hold that the district court erred in granting summary judgment with respect to Plaintiffs' claims that Defendants Warden Dennis Sisto and Captain James Neuhring impermissibly convened a staff meeting that resulted in the absence of all floor officers from the building where St. Jovite was incarcerated for a period of as long as three and a half hours because those claims present triable issues of fact. A jury could conclude, on the basis of the factual record before the district court, that the complete withdrawal of all supervision created an unconstitutional risk of harm to the mentally ill inmates in St. Jovite's building and that Sisto and Neuhring were responsible for, and deliberately indifferent

to, this lack of supervision. The jury could also conclude that the lack of floor staff was an actual and proximate cause of St. Jovite's death. We affirm, however, the grant of summary judgment on the inadequate staffing claim with respect to Defendants Lieutenant Gordon Wong, Sergeant Gale Martinez, and Sergeant Cheryl Orrick.

We also hold that the district court erred in granting summary judgment with respect to Plaintiffs' claims based on the failure to administer CPR by Defendants Officer Rebecca Cahoon and Officer Chris Holliday. We conclude that there is a triable issue of fact as to whether Defendants Cahoon and Holliday were deliberately indifferent to St. Jovite's potentially serious medical need when they first arrived at his cell. We affirm with respect to Plaintiffs' claims for failure to provide proper medical treatment with respect to the remaining defendants. We also affirm with respect to the failure to train claims.

Accordingly, we vacate the summary judgment as to the claims against Defendants Sisto and Neuhring for withdrawing all floor officers from St. Jovite's building, and as to the claims against Defendants Cahoon and Holliday for failure to provide CPR and remand for further proceedings with respect to these claims.

## I.   Background

Robert St. Jovite was found unconscious and unresponsive in his cell at CSP-Solano on May 10, 2006. During his incarceration, St. Jovite was treated for depression, anxiety, panic attacks, and early stages of agoraphobia. After his last treatment session, St. Jovite filled out an inmate appeal form in which he stated that his "daily

life [was] almost unmanageable" as a result of his mental condition. St. Jovite never expressed any suicidal thoughts, intentions, or feelings to his treating psychiatrist, however, and his psychiatrist saw no evidence of suicidal ideation during his treatment or through his review of St. Jovite's medical records.

In order to explain St. Jovite's death, we first recount the circumstances that led to his being left without supervision, along with his fellow inmates, for as much as three and a half hours. We then recount the chaotic and disputed circumstances surrounding the response of CSP-Solano's staff to St. Jovite's apparent suicide as stated by the parties, in that same light. As we must at the summary judgment stage, we view the relevant facts in the light most favorable to Plaintiffs.

## A. The Staffing of Building 8

The high rate of suicides in California prisons was a "focus" of California prison administrators, including those at CSP-Solano, from 2004 onwards as a result of the *Coleman v. Schwarzenegger* litigation.[1] In addition to suicide concerns,

---

[1] The *Coleman* litigation deals, among other issues related to inmate health, with the high rate of suicides in California Department of Corrections and Rehabilitation ("CDCR") prisons. In particular, the *Coleman* Special Master submitted a report for the year 2005, the year before St. Jovite died, indicating that 43 inmates committed suicide in CDCR prisons that year, a rate of ~26 suicides per 100,000 inmates – almost double the national average. *See Coleman v. Brown*, No. 90-00520, Doc. No. 2566 at 1–2 (E.D. Cal. Nov. 26, 2007). Of these 43 suicides, four took place at CSP-Solano, and at least three of the CSP-Solano inmates who committed suicide were mentally ill inmates with the same classification as St. Jovite. Because the *Coleman* special master's reports

inmate-on-inmate violence was also a problem at CSP-Solano. Warden Sisto explained that when he was hired to run CSP-Solano he was told that the prison "needed some work" and that "due to all the violence they were having, they continued to have lockdowns, a lot of violence."

St. Jovite was housed on the second tier in Building 8 of CSP-Solano. Each of the two tiers in Building 8 had fifty cells, and there were roughly 190 inmates between them at the time of St. Jovite's death. Building 8 was the designated facility at CSP-Solano for housing inmates who utilized certain psychotropic medications[2] including patients classified as Correctional Clinical Case Management System inmates ("CCCMS"), a status given to inmates with psychiatric illnesses. The majority of the inmates in Building 8, including St. Jovite and his cell mate John Lee Harden, were classified as CCCMS inmates, meaning they suffered from any of a variety of psychiatric illnesses. CCCMS is the lowest level of care in the State's prison mental health delivery system, and is designed to provide a level of care equivalent to that received by non-incarcerated patients through outpatient psychiatric treatment. Although CSP-Solano provided air conditioned facilities and otherwise protected the inmates from exposure to heat, it did not provide any additional security to the inmates in Building 8.

---

are court filings, it is appropriate to take judicial notice of them. *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006).

[2] This is because Building 8 is air conditioned and patients using certain psychotropic medications, or "heat meds," cannot be exposed to extreme heat because of the high risk that they will suffer a heat stroke.

The security staffing at CSP-Solano was broken into three watches: first watch (10:00 p.m. to 6:00 a.m.), second watch (6:00 a.m. to 2:00 p.m.), and third watch (2:00 p.m. to 10:00 p.m.). During the daytime watches (second and third watch), Building 8 was staffed with two floor officers and one control booth officer. During the graveyard shift (first watch), Building 8 had a leaner staff, with a control booth operator and one floor officer who split his time between Building 8 and another housing unit.

According to the Post Orders[3] for correction officers at Building 8, one of a floor officer's "primary function[s] is to act as a safeguard against suicide attempts as well as fires set by inmates within the unit." Naturally, floor officers are also responsible for preventing crime, including inmate-on-inmate violence, and maintaining order and safety. In order to accomplish these goals, "[s]ecurity inspections of the unit shall be made upon assuming and prior to leaving the post *and on an irregular basis throughout the shift*" (emphasis added). Security checks are supposed to be performed at least after every unlock, and at least once an hour during daytime watches regardless of whether there has been an unlock. According to Neuhring, the Facility Captain in charge of Building 8 and the officer who called the May 10 staff meetings during which St. Jovite's apparent suicide attempt occurred, "[i]f the [floor] officers are doing their job" they should regularly be "checking their tiers" and "walking around." The purpose of doing so is to "check[] the welfare of the inmates, both looking for crime occurring and their welfare."

---

[3] Post Orders are written, standing orders describing the duties and responsibilities of officers in a given position in the California State Prison system.

The extended absence of floor officers at Building 8 was generally considered unacceptable. Neuhring stated that floor officers should not all be pulled from the floor at the same time except in "very rare" circumstances and that such absences "shouldn't be getting longer than [15–30 minutes]. It may be go [sic] into 45 minutes, but not normally." Sisto stated that if any inmates were out of their cells "you don't pull a floor officer out of the building." By contrast, during the graveyard shift, when prisoners are asleep, Sisto considered it acceptable for there to be no floor officer actively patrolling for up to an hour and a half, but two hours "would be pushing it."[4]

CSP-Solano's supervisors' views of what was safe was more lax than the standards promulgated by the American Correctional Association and the CDCR. Those standards, as explained by Plaintiffs' expert witness, mandate that "all special management inmates [be] personally observed by a correctional officer at least every 30 minutes on an irregular schedule."

When Defendants Cahoon and Holliday, the third shift floor officers assigned to Building 8 on May 10, 2006, reported for duty at Building 8 shortly before 2:00 p.m., they were both told to report directly to a staff meeting convened by Neuhring rather than conducting the beginning-of-shift

---

[4] However, Sisto's predecessor as warden, Thomas Carey, stated that he was unaware that it was *ever* the case that there were no floor officers on duty in Building 8.

security check that was required by their Post Orders.[5] According to Holliday, the floor officers from the second watch were also not on the floor at Building 8 at the time that he and Cahoon were told to report to the staff meeting, as second watch's floor officers also had been called into a staff meeting on the same subject, sometime between 12:00 and 12:30 p.m.[6] This left only Control Booth Officer Jaime Chua on watch in Building 8, but he was not permitted to leave the control booth for any reason, and could not see into most cells from his control booth. Harden testified that at some point around 12:30 p.m., a prison official announced to the inmates of Building 8 that a staff meeting was occurring. As a result, the inmates were on notice that they were unsupervised.

Cahoon and Holliday returned to Building 8 around 3:30 p.m. At that point, viewing the evidence in the light most favorable to Plaintiffs, the inmates in Building 8 had been left without any floor supervision, without security checks, and without any prison official (other than the control booth officer) able to respond to an emergency call, for as much as three and a half hours. Although Cahoon and Holliday believed that Building 8 was on lockdown during their

---

[5] Some evidence suggests that the meetings concerned the stabbing of a prison guard at another CDCR facility, but as Plaintiffs note, this fact is not clearly established in light of the fact that only Cahoon could recall the subject of the meetings; Neuhring himself could not. Although Sisto did not remember approving the meetings, Neuhring testified that it would have been necessary for the Warden to have approved any such meetings.

[6] Neuhring explained that his custom, when convening staff meetings, was to schedule back-to-back meetings: one with outgoing staff from an earlier watch, followed immediately by another meeting with the incoming staff from the later watch.

absence, when they returned there were 10 or 15 inmates who "weren't supposed to be out" milling around in the day room.

## B. St. Jovite's Death

Almost immediately upon their return, Cahoon and Holliday heard St. Jovite's cell mate Harden yelling "man down." After identifying which cell the shouts were coming from, Cahoon and Holliday went up to the second tier, where the cell was located. Cahoon testified that through the cell door she saw St. Jovite sitting on the ground with his back against the corner of the door. Harden was standing above St. Jovite and looked like he was slapping him. Believing that Harden and St. Jovite had been fighting, Cahoon told Harden to back away and asked what happened. Harden stated that he had been asleep and woke up to find St. Jovite hanging from the grill over the sink.

The events that followed are disputed, and the evidence in the record is contradictory. Defendants, relying primarily on the incident reports and deposition testimony of Cahoon and Holliday, argue that Cahoon called a medical code 2 at that time, 3:44 p.m., and sent Holliday to get a cut-down kit and CPR mask from the control booth. While waiting for Holliday to return, Cahoon saw Defendant Medical Technical Assistant Shabreen Hak (MTA Hak) approaching the building and Defendant Search and Escort Officer Raymond Wade coming up the stairs to the second tier. CSP-Solano policy was that staff members could not open a cell door without at least one other staff member present, so Cahoon waited until Hak and Wade were close and then signaled to Chua, the control booth officer, to open the cell door. According to Defendants, MTA Hak arrived at 3:45 p.m. just as the cell door was opening. Holliday testified that he arrived back at

the cell door with the cut-down kit along with MTA Hak and Wade. After cracking the door open, Cahoon saw that St. Jovite had a noose around his neck and instructed Wade to call a medical code 3.

When the door opened fully, St. Jovite, who had been sitting against the corner of the cell, rolled onto his back until his body was partially protruding from the cell. Wade then escorted Harden downstairs. Cahoon described St. Jovite as cold to the touch with a sheet around his neck, a purplish color on his face, and dried mucous and spit around his mouth. Cahoon attempted to get a response from him by saying "Hey, St. Jovite." Holliday similarly asked St. Jovite if he was okay, but St. Jovite did not respond. Because MTA Hak was at the scene, Cahoon and Holliday deferred to her, as medical staff, and stayed a few feet away from where St. Jovite was on the floor.

Plaintiffs disagree with this sequence of events. Specifically, Plaintiffs dispute when Cahoon and Holliday called the medical code 2 and ordered Chua to open the cell door. They also contest whether MTA Hak arrived as the cell door was opening or at some point after it had been opened by Chua with St. Jovite already on the floor. Plaintiffs rely on the incident report prepared by Chua, the control booth officer who opened the cell door, which states that after Cahoon and Holliday looked inside the cell, they instructed Chua to unlock the door, went inside, and thereafter called for a medical code 2. The summary report prepared by Defendant Lieutenant Gordon Wong similarly states that Cahoon and Holliday ordered Chua to open the cell door and discovered St. Jovite unconscious prior to calling the medical code 2. Moreover, six of the incident reports originally reported that the medical code 2 was called at 3:40 p.m., not 3:44 p.m. as

Cahoon and Holliday contend. Wong later instructed officers (including Chua and MTA Hak) to change the time in their reports to 3:44 p.m., so that it coincided with the time that Cahoon and Holliday had indicated in their reports. Several other incident reports, however, remained unchanged and stated that the medical code was called at 3:40 p.m.

Plaintiffs contend that this evidence supports a finding that Cahoon and Holliday called the medical code at 3:40 p.m., and that MTA Hak did not arrive until five minutes later, at 3:45 p.m., when St. Jovite was already on the floor. They argue that Cahoon and Holliday waited five minutes after discovering St. Jovite without providing any assistance.

The district court noted that although many of the incident reports were altered to modify the time Cahoon placed the medical code 2 call, "[t]he incident reports do not show that Hak's arrival time was changed." The court therefore held that "it is uncontroverted that Hak arrived as soon as the area was secured." The district court failed to note, however, that (1) no incident reports besides those of Cahoon and Holliday mentioned MTA Hak arriving as the door opened, and (2) Chua, who actually opened the door, reported that Cahoon and Holliday entered the cell initially upon arrival and thereafter called the medical code. MTA Hak testified that she believes she drove a golf cart to Building 8 in response to the medical code, calling into question whether she could have responded to the scene at 3:45 p.m., one minute after the medical code was called at 3:44 p.m., as Defendants contend. There are, therefore, factual disputes as to whether Cahoon and Holliday opened the cell door and found St. Jovite laying unconscious before calling the medical code, when the medical code 2 call was placed, and when MTA Hak arrived at the scene.

Starting with MTA Hak, a succession of medical personnel arrived, each briefly assessing St. Jovite and then deferring to the next to arrive. Other custodial staff members – Defendants Wong, Sergeant Cheryl Orrick, Sergeant Gale Martinez, Officer Alfredo Alcaraz, and non-defendant Officer N. Soliz – arrived intermittently. According to MTA Hak, she arrived at the scene at 3:45 p.m., and remembers the officers standing around. MTA Hak testified that she unsuccessfully checked for a pulse, observed that St. Jovite was purplish in color and that his feet were cold, and believed that he had gone into rigor mortis. MTA Hak then began applying an automated external defibrillator (AED) on St. Jovite by sticking patches on his chest. As she did so, Registered Nurse Gregory Hill (RN Hill) arrived at approximately 3:48 p.m.[7] The AED produced a flat line, and MTA Hak stepped aside to allow RN Hill to examine St. Jovite. RN Hill noted that St. Jovite had a purplish color on his face, chest, and right shoulder, found no pulse, and noted that his eyes were dilated.

Wade, who arrived at around the same time as MTA Hak, proceeded to secure Building 8 and later stepped outside to provide coverage for the code 3 ambulance. Martinez testified that, when she arrived at the scene, MTA Hak was standing by the cell door. Martinez did not perform CPR because medical personnel were present and custodial staff do not interfere with medical staff. Orrick arrived at the scene and took on the role of incident scribe. Orrick did not perform CPR because medical staff were present. Wong arrived sometime later and testified that when he arrived, nothing was being done to St. Jovite. Everyone was standing around, trying to get a response from St. Jovite by talking to him.

---

[7] RN Hill is no longer a defendant in this action.

Wong, like Martinez and Orrick, did not perform CPR or order someone else to perform CPR because medical staff were present. Alcaraz arrived and, as a security and investigations officer, documented the scene by taking pictures.

Defendant Supervising Registered Nurse Dorothy Hicks (SRN Hicks) was the next medical staff member to arrive, but it is unclear when she did so. SRN Hicks likely arrived at the scene sometime within the fifteen minute window between 3:50 p.m. and 4:05 p.m. According to SRN Hicks, when she arrived, MTA Hack, RN Hill, and the other responders "were standing around [St. Jovite] and nothing was being done." SRN Hicks found that St. Jovite "had severe bluish discoloration from the nipple line up; there was no spontaneous respirations; his pupils were fixed and dilated; and there was no carotid pulse." SRN Hicks also determined that "[t]here was no lividity or rigor mortis. . . . So [St. Jovite's death] was pretty recent." SRN Hicks nevertheless determined that death was irreversible.

When Dr. Noriega arrived, MTA Hak and SRN Hicks were standing over St. Jovite. SRN Hicks deferred to Dr. Noriega, who also determined that St. Jovite was dead and beyond revival, although he did not pronounce St. Jovite dead. Paramedics from Vaca Valley Hospital arrived at approximately 4:09 p.m. and began CPR on St. Jovite, along with other attempts to revive him. These attempts were unsuccessful, and St. Jovite was pronounced dead by Dr. H. Zimmerman from Vaca Valley Hospital via phone at 4:29 p.m.

In *Coleman*, the court issued an order to the CDCR requiring that a policy be implemented requiring custodial

staff to provide immediate life support to inmates until medical staff arrives. *Coleman*, No. 90-00520, Doc. No. 1668 at 1–2 (E.D. Cal. June 9, 2005). In response, the CDCR amended its CPR policy and implemented it through a memo authored by Director John Dovey ("the Dovey Memo"). The Dovey memo provided that:

> All peace officers who respond to a medical emergency are mandated . . . to provide immediate life support, if trained to do so, until medical staff arrives to continue life support measures. . . . A Correctional Peace Officer's initiation of life support does not relieve responding medical personnel of their responsibility to assume life saving efforts upon arrival. Responding medical personnel shall assume primary responsibility in the provision of medial attention and life saving efforts upon their arrival. The combined efforts of both custody and medical personnel are expected. Both custody and medical personnel are responsible to continue life saving efforts in unison as long as necessary.

Defendant Tom Carey was the warden at CSP-Solano from July 2001 to March 31, 2006, and was replaced by Defendant D.K. Sisto on May 9, 2006, one day prior to this incident. In a declaration to the *Coleman* court in January 2007, Carey averred that 99.9% of CSP-Solano's designated employees had been trained in the performance of CPR and all but forty-one had received training on the amended CPR policy. Following St. Jovite's death, it was determined that MTA Hak and RN Hill "need[ed] instruction as to immediate implementation of CPR even when there are no signs of life.

Training was completed 5/11/06," one day after St. Jovite's death. Defendant Dr. Alvaro Traquina was the Chief Medical Officer at CSP-Solano and was responsible for ensuring that medical staff was properly trained and certified in providing medical care, including life saving measures such as CPR.

## II. Discussion

A district court's grant of summary judgment in a § 1983 action is reviewed de novo. *See Pinard v. Clatskanie School Dist. 6J*, 467 F.3d 755, 763 (9th Cir. 2006). We must determine "whether, viewing the evidence in the light most favorable to the non-moving party, there are genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc). "An issue of material fact is genuine 'if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.'" *Thomas v. Ponder* 611 F.3d 1144, 1150 (9th Cir. 2010) (quoting *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006)).

For an inmate to bring a valid § 1983 claim against a prison official for a violation of the Eighth Amendment, he must first "objectively show that he was deprived of something 'sufficiently serious.'" *Foster v. Runnels*, 554 F.3d 807, 812 (9th Cir. 2009) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). "A deprivation is sufficiently serious when the prison official's act or omission results 'in the denial of the minimal civilized measure of life's necessities.'" *Id.* (quoting *Farmer*, 511 U.S. at 834).

Next, the inmate must "make a subjective showing that the deprivation occurred with deliberate indifference to the

inmate's health or safety." *Foster*, 554 F.3d at 812. To satisfy this subjective component of deliberate indifference, the inmate must show that prison officials "kn[e]w[] of and disregard[ed]" the substantial risk of harm, but the officials need not have intended any harm to befall the inmate; "it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 837, 842.

Finally, plaintiffs alleging deliberate indifference must also demonstrate that the defendants' actions were both an actual and proximate cause of their injuries. *See Conn v. City of Reno*, 591 F.3d 1081, 1098–1101 (9th Cir. 2010), *vacated by* 131 S. Ct. 1812 (2011), *reinstated in relevant part* 658 F.3d 897 (9th Cir. 2011).

Vicarious liability may not be imposed on a supervisor for the acts of lower officials in a § 1983 action. *Fayle v. Stapley*, 607 F.2d 858, 862 (9th Cir. 1979). A prison official in a supervisory position may be held liable under § 1983, however, "if he or she was personally involved in the constitutional deprivation or a sufficient causal connection exists between the supervisor's unlawful conduct and the constitutional violation." *Lolli v. Cnty. of Orange*, 351 F.3d 410, 418 (9th Cir. 2003) (quoting *Jackson v. City of Bremerton*, 268 F.3d 646, 653 (9th Cir. 2001)). This causal connection can include: "1) [the supervisors'] own culpable action or inaction in the training, supervision, or control of subordinates; 2) their acquiescence in the constitutional deprivation of which a complaint is made; or 3) [their] conduct that showed a reckless or callous indifference to the rights of others." *Cunningham v. Gates*, 229 F.3d 1271, 1292 (9th Cir. 2000).

Parents and children may assert Fourteenth Amendment substantive due process claims if they are deprived of their liberty interest in the companionship and society of their child or parent through official conduct. *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010) (citing *Curnow ex rel. Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991)); *see also Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 371 (9th Cir. 1998). "[O]nly official conduct that 'shocks the conscience' is cognizable as a due process violation." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). Just as the deliberate indifference of prison officials to the medical needs of prisoners may support Eighth Amendment liability, such indifference may also "rise to the conscience-shocking level" required for a substantive due process violation. *Lewis*, 523 U.S. at 849–50. A prison official's deliberately indifferent conduct will generally "shock the conscience" so as long as the prison official had time to deliberate before acting or failing to act in a deliberately indifferent manner. *See Tennison v. City and Cnty. of San Francisco*, 570 F.3d 1078, 1089 (9th Cir. 2009); *Porter v. Osborn*, 546 F.3d 1131, 1138 (9th Cir. 2008).

## A.  Removal of Floor Officers

Plaintiffs contend that by removing the floor officers from Building 8 for several hours during the middle of the day, Defendants Sisto, Neuhring, Wong, Martinez, and Orrick ("Supervisory Defendants") deprived St. Jovite of the availability of "medical or mental health treatment" and "meaningful supervision protecting him from harm," both of which were sufficiently serious deprivations to form the basis of an Eighth Amendment violation.

The district court did not evaluate the objective "sufficiently serious" prong, *see* above at 18, instead ending its analysis after determining that Defendants' actions in removing the floor officers did not satisfy the subjective "deliberate indifference" prong. The district court held that "[e]ven assuming that each of [the Supervisory] Defendants was responsible for the removal decision, the record is devoid of evidence from which it can reasonably be inferred that any Defendant knew the removal would subject St. Jovite to a substantial health or safety risk," and further, that "there [is no] evidence in the record from which it can be reasonably inferred that the removal created an 'obvious' risk of harm to St. Jovite."(citing *Thomas*, 611 F.3d at 1150). We disagree with respect to Defendants Sisto and Neuhring, but we affirm with respect to Defendants Wong, Martinez and Orrick.

### 1. Sufficiently Serious Prong

In a failure to protect claim, an inmate satisfies the "sufficiently serious deprivation" requirement by "show[ing] that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. The objective question of whether a prison officer's actions have exposed an inmate to a substantial risk of serious harm is a question of fact, and as such must be decided by a jury if there is any room for doubt. *Conn*, 591 F.3d at 1095 (holding that the objective question of whether there was a substantial risk that an arrestee might commit suicide should be decided by a jury); *see also Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011); *Howard v. Waide*, 534 F.3d 1227, 1237 (10th Cir. 2008).

Inadequate staffing can create an objective risk of substantial harm in a prison setting that is sufficient to satisfy

the objective prong of the deliberate indifference test. *See Hoptowit v. Ray*, 682 F.2d 1237, 1251 (9th Cir. 1982), *abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995). "[H]aving stripped [inmates] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Farmer*, 511 U.S. at 833. Morever, in order to satisfy the objective prong, it is enough for the inmate to demonstrate that he was exposed to a substantial risk of some range of serious harms; the harm he actually suffered need not have been the most likely result among this range of outcomes. *See Gibson v. Cnty. of Washoe, Nev.*, 290 F.3d 1175, 1193 (9th Cir. 2002). "[I]t does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk . . . for reasons personal to him or because all prisoners in his situation face such a risk." *Farmer*, 511 U.S. at 843. Therefore, it is relevant here that St. Jovite was not just exposed to a risk of suicide, but also to the risk of harm from other mentally ill inmates in Building 8, including his cell mate.[8]

Plaintiffs have established a triable issue of fact as to whether the withdrawal of all floor staff from Building 8 for up to three and a half hours created an objectively substantial risk of harm to the unsupervised inmates in Building 8. At CSP-Solano, as in most prisons, inmate suicides and violence

_____

[8] St. Jovite's cell mate Harden, for example, suffered from a bi-polar disorder. In their reply brief, Plaintiffs suggest for the first time the possibility that St. Jovite was actually killed by Harden, rather than having committed suicide. Regardless of whether this theory of the case was properly raised, its plausibility further emphasizes the dangers that St. Jovite was exposed to by the extended lack of supervision at Building 8 on the day of his death.

are the primary dangers floor officers are charged with preventing. As described above, these problems were acute at CSP-Solano. Floor staff, supervisors, and Plaintiffs' expert witness (a former prison warden with decades of experience in the field), provided sworn statements or testimony that inmates should not be left without supervision for extended periods of time. Floor officers' Post Orders required them to conduct security checks and searches of inmates and cells on no less than an hourly basis during daytime watches, and to do so on an irregular schedule designed to ensure that inmates could not anticipate when they might be observed. None of the prison officials who were deposed indicated that a three-hour-plus absence of floor staff during the day would be permissible. On such a record a reasonable jury could find that the withdrawal of all floor officers posed a substantial risk that some inmate would come to harm, either self-inflicted or otherwise, and that an inmate suffering such harm would not receive swift medical attention as a result of the inadequate staffing.

The danger posed to Building 8's inmates by the withdrawal of all supervisory floor staff for up to three and a half hours was exacerbated by the fact that most of the inmates at Building 8 were mentally ill. A jury could infer that unsupervised mentally ill inmates housed together are more likely to harm themselves or others than are inmates in the regular prison population. There was evidence that would support such an inference. Plaintiffs' expert opined that mentally ill CCCMS inmates in Building 8 should not be left unsupervised for more than 30 minutes, explaining that CCCMS inmates "can have a need for staff response in a moment's notice, and the staff need[s] to be there to respond and especially so if it's a life/health/safety issue. . . . The Control Booth Officer on whom the Wardens rely in

removing the floor staff, is too far removed from direct contact and surveillance of CCCMS inmates." In reaching this conclusion, Plaintiffs' expert was informed by the ACA's standards and CDCR regulations. Although such standards do not set the constitutional minimum for prison conditions, a jury could consider these guidelines in determining whether the circumstances on May 10, 2006 at Building 8 presented an objectively substantial risk that one of the mentally ill inmates there might suffer serious harm as a result being left unsupervised for an extended period of time. *See Hoptowit*, 682 F.2d at 1249 (noting that the state standards, though not establishing the constitutional minimum, are "relevant evidence" of whether prison conditions violate the Eighth Amendment).

The State, however, argues that because Building 8 was often without a floor officer for one and a half hours during the graveyard shift, the three and a half hour lack of supervision during the daytime shifts did not constitute a substantial risk of serious harm to the CCCMS inmates in Building 8. Even assuming, without deciding, that CSP-Solano's practices at Building 8 during the graveyard shift were safe or reasonable, it does not follow that the same practices were safe or reasonable during the daytime watches or, more to the point, that a jury could not reasonably conclude to the contrary. Under CSP-Solano's staffing practices, Building 8 is required to be staffed by one control booth operator and two floor officers during the daytime watches, but only one control booth operator and a single floor officer, who is also responsible for monitoring a second building, during the graveyard shift. A jury could reasonably infer that CSP-Solano officials recognized a general need for additional security during the day, and that the reason for providing less security at night is that inmates are less of a

danger to themselves during the graveyard shift and that more supervision is required during daylight hours.

In sum, Plaintiffs have established a triable issue of fact as to whether the withdrawal of all floor staff from Building 8 for up to three and a half hours created an objectively substantial risk of harm to the unsupervised inmates in Building 8.

### 2. Deliberate Indifference Prong

As a preliminary matter, we must first address Plaintiffs' contention that the district court misapplied the "deliberate indifference" standard by discussing only whether the Supervisory Defendants knew that the removal decision posed a serious risk of harm to St. Jovite specifically. Instead, Plaintiffs argue that the proper question is whether the decision to remove the floor staff from Building 8 posed a serious risk of substantial harm to any prisoner.

Plaintiffs are correct. The appropriate inquiry was whether the Supervisory Defendants were aware that removing all floor officers from Building 8 for over three and a half hours would pose a substantial risk of serious harm to someone in St. Jovite's situation, not simply whether they were subjectively aware of St. Jovite's specific medical needs. *See Gibson*, 290 F.3d at 1191 ("We note that the question of whether the County policies violated Gibson's rights does not hinge on whether County policymakers knew that the County's policies would pose a substantial risk of serious harm to *Gibson*, in particular. As long as a jury can infer that the policymakers knew that their policy of not screening certain incoming detainees would pose a risk to someone in Gibson's situation, we must reverse the summary

judgment in favor of the County."); *see also Farmer*, 511 U.S. at 843–44; *Redman v. Cnty. of San Diego*, 942 F.2d 1435, 1435, 1448 (9th Cir. 1991) (en banc).

This subjective inquiry involves two parts. First, Plaintiffs must demonstrate that the risk was obvious or provide other circumstantial or direct evidence that the prison officials were aware of the substantial risk to the Building 8 inmates' safety. *Thomas*, 611 F.3d at 1150. Second, they must show that there was no reasonable justification for exposing the inmates to the risk. *Id.* Both of these inquiries are fact-intensive and typically should not be resolved at the summary judgment stage; as the Supreme Court has explained, "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842 (citation omitted); *see Conn*, 591 F.3d at 1097; *Thomas*, 611 F.3d at 1152; *Gibson*, 290 F.3d at 1190–91. Applying the correct subjective inquiry here, we hold that Plaintiffs created a triable issue of fact as to whether Defendants Sisto and Neuhring are liable for St. Jovite's death under the subjective component of the deliberate indifference test. We affirm, however, with respect to Defendants Wong, Martinez and Orrick because they did not act unreasonably under the circumstances.

### a.  *Neuhring and Sisto*

First, Plaintiffs have presented sufficient evidence from which a jury could conclude that Neuhring and Sisto were both aware of the risks posed by withdrawing all floor officers from Building 8 for over three hours. A jury could

find the risks of leaving mentally ill inmates unsupervised for over three hours to be obvious. Moreover, obviousness is not measured by what is obvious to a layman, but rather by what would be obvious "in light of reason and the basic general knowledge that a prison official may be presumed to have obtained regarding the type of deprivation involved." *Thomas*, 611 F.3d at 1151. The *Coleman* litigation was well known in penological circles and to officials at CSP-Solano. That litigation specifically alerted prison officials to the acute problem of inmate suicides in CDCR prisons, including CSP-Solano.

Even without this background, the record contains circumstantial evidence from which a reasonable jury could conclude that Sisto and Nuehring were aware of the risks. This case is similar in many ways to our decision in *Gibson*, 290 F.3d 1175. In *Gibson*, we held that the county was not entitled to summary judgment as to whether its policy of delaying mental health screenings for recently arrested, combative detainees was deliberately indifferent to the possibility that some combative mentally ill detainee might suffer harm as a result of being jailed without receiving an immediate screening. *See id.* at 1190. We found that a triable issue of deliberate indifference existed in light of circumstantial evidence that: (1) jail officials knew that some combative detainees suffer from mental illness, (2) the jail had policies demonstrating its awareness that such mentally ill individuals sometimes require care urgently, and (3) the jail had abandoned a previous practice designed to address this need. *Id.* at 1190–91.

Similarly, here, Sisto and Neuhring were aware that the majority of the inmates in Building 8 were CCCMS inmates and used psychotropic "heat meds." The Post Orders for

Building 8 floor staff state that prevention of, and immediate response to, suicide attempts is a "primary" duty of floor staff, and therefore require floor officers to continuously circulate on an irregular schedule in between formal searches and security checks. Neuhring described this continuous supervision as "necessary" to protect the safety and security of the inmates. Finally, on the day of St. Jovite's death, the evidence shows that Sisto and Neuhring failed to follow these policies. Just as in *Gibson*, here a jury could conclude from these facts that Sisto and Neuhring were aware that their actions would result in a substantial risk of harm to inmates such as St. Jovite.

With respect to Sisto, the State argues that he was unaware of the meetings, and notes that there is no *respondeat superior* liability under § 1983. Although the State's statement of the law is correct, its description of the facts is not. The State disregards the fact that Neuhring said that staff meetings involving all floor officers could not have occurred without approval by the Warden. This is sufficient to create a disputed question of fact as to whether Sisto authorized these particular staff meetings and whether he was, therefore, deliberately indifferent to the risks they created. *See Redman*, 942 F.2d at 1447 (finding a subordinate's testimony that he acted under the direction of a superior sufficient to create a triable issue of fact as to the supervisor's § 1983 liability).

Second, Plaintiffs presented sufficient evidence for a jury to conclude that there was no reasonable justification for the decision to withdraw all floor officers from Building 8 for over three hours without putting in place any plan to ensure inmate safety. A prison official's justification for exposing inmates to a substantial risk of harm is reasonable only if it

represents a proportionate response to the penological circumstances in light of the severity of the risk to which the inmates are exposed. *See Thomas*, 611 F.3d at 1154–55. Except in emergency situations, a failure to consider reasonable alternatives is strong evidence that a prison official's actions were unreasonable. *Id.* at 1155.

The record would allow a jury to conclude that there was no emergency at CSP-Solano on May 10, 2006, and that there was no other reasonable explanation for conducting back-to-back, 90-minute staff meetings, thus leaving the inmates in Building 8 unsupervised for over three hours. Neuhring stated that staff meetings should not – and did not – typically exceed 45 minutes because "we're cognizant [when holding staff meetings] of the fact that we have both [floor] staff out of the housing units." Yet, although some evidence suggests that the staff meetings concerned the subject of an assault on a guard at another prison, Neuhring himself could not recall their purpose. This would permit a jury to infer that the meetings were not a response to an unprecedented crisis.

The record also demonstrates that other alternatives to the lengthy staff meetings were readily available. Neuhring himself explained that when he was a sergeant he would frequently disseminate critical information to floor officers by "pull[ing] them all out to the yard, the center of the yard, for 10 or 15 minutes to go over whatever is occurring." Furthermore, even assuming, *arguendo*, that there was some justification for conducting a one and a half hour staff meeting with each watch, the record contains no explanation why it was necessary to stack two such staff meetings back-to-back, thereby doubling the amount of time that the inmates

were left unsupervised.[9]  In short, a jury could conclude that Neuhring and Sisto (assuming he approved of the meetings) lacked any reasonable basis for calling consecutive staff meetings that left the inmates of Building 8 unsupervised for over three hours on the afternoon of St. Jovite's death.

### b.  Wong, Martinez, and Orrick

Lieutenant Wong and Sergeant Martinez were the supervising officers in Building 8 at the time of the staff meetings. Sergeant Orrick was the supervising officer at a different building at CSP-Solano. For the same reasons that there is a triable issue of fact as to whether Sisto and Neuhring were aware of the objective risk posed by withdrawing all floor officers from Building 8 for up to three and a half hours, Plaintiffs also created a triable issue of fact as to whether Wong, Martinez, and Orrick were aware of the risks posed by the staff meetings.

Plaintiffs have not, however, created a triable issue of fact as to whether Wong, Martinez and Orrick's actions were reasonably justified. With respect to Orrick, there is no doubt that her actions were reasonable. She was staffed at an entirely different building and, therefore, it was not unreasonable for her to fail to take any action at Building 8.

---

[9] The State argues, without citation, that the decision to convene the staff meetings in this fashion "is entitled to deference." Even if we generally owe deference to prison officials' day-to-day determinations of penological necessity, *see, e.g.*, *Turner v. Safley*, 482 U.S. 78, 84–85 (1987), such deference is unjustified under these circumstances in which the prison official in question cannot recall the purpose of the staff meetings and fails to explain his reasoning or how his decision was consistent with his prior practice regarding staff meetings, *cf. Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

Accordingly, we affirm the district court's grant of summary judgment in her favor.

The issue is closer in the cases of Wong and Martinez. They were the officers responsible for ensuring that floor officers were performing their duties at Building 8 on the day of St. Jovite's death. Nonetheless, under these unique circumstances, in which Captain Neuhring ordered the floor staff supervised by Wong and Martinez to attend the staff meetings without allowing Wong and Martinez time to make alternative staffing arrangements, no reasonable jury could conclude that Wong and Martinez acted unreasonably.

### 3. Causation

"If reasonable persons could differ" on the question of causation then "summary judgment is inappropriate and the question should be left to a jury." *White*, 901 F.2d at 1506; *see Conn*, 591 F.3d at 1100. The State does not contend that Plaintiffs failed to create a triable issue of fact regarding actual or proximate causation with respect to the failure to protect claim, assuming that Defendants were deliberately indifferent to the risks posed by withdrawing all floor staff from Building 8.

The State is right not to do so. As a practical matter, plaintiffs who have already demonstrated a triable issue of fact as to whether prison officials exposed them to a substantial risk of harm, and who actually suffered precisely the type of harm that was foreseen, will also typically be able to demonstrate a triable issue of fact as to causation. *See, e.g.*, *Conn*, 591 F.3d at 1098–1101; *White v. Roper*, 901 F.2d 1501, 1505 (9th Cir. 1990). That is the case here. Just as the jury could conclude that Sisto and Neuhring were deliberately

indifferent to the risks that an inmate would be seriously harmed during a three-hour-plus period without supervision, so too could the jury conclude that such harm could have been prevented with adequate supervision.

Accordingly, we hold that summary judgment should not have been granted to Defendants Neuhring and Sisto with respect to Plaintiffs' claims that the withdrawal of all floor officers from Building 8 for over three hours violated St. Jovite's Eighth Amendment right to be free from cruel and unusual punishment.  To be sure, a jury could reasonably find in favor of these Defendants, but at this stage, it matters only that there is a genuine issue of material fact as to these claims, such that summary judgment should not have been granted. Similarly, because Plaintiffs created a triable issue of fact as to whether Neuhring and Sisto acted with deliberate indifference to St. Jovite's safety, and because their decision to convene the staff meetings was made with time to deliberate, summary judgment should not have been granted with respect to Plaintiffs' substantive due process claims against Neuhring and Sisto. *See Lewis*, 523 U.S. at 849–50; *Tennison*, 570 F.3d at 1089.

## B. *Failure to Administer CPR or Other Life-Saving Measures*

The district court granted summary judgment to Defendants Cahoon, Holliday, Wade, Alcaraz, Chua, Wong, Martinez, and Orrick, with respect to Plaintiffs' failure to administer CPR claim, concluding that each "deferred to the judgment of the medical staff members concerning whether CPR or other life-saving measures should be used on St. Jovite." The district court held that these Defendants reasonably relied on the medical staff and therefore did not

act with deliberate indifference to the medical needs of St. Jovite. As to MTA Hak, who was the first medical officer to arrive at the scene, the district court held that the evidence did not show that she was subjectively aware that St. Jovite could be revived before she stepped aside to allow RN Hill to assess St. Jovite. The district court further concluded that SRN Hicks and Dr. Noriega performed a medical assessment on St. Jovite and determined that he could not be revived and that Plaintiffs did not provide any evidence indicating that this assessment was inaccurate. The court concluded, therefore, that they did not act with deliberate indifference.

"To set forth a constitutional claim under the Eighth Amendment predicated upon the failure to provide medical treatment, first the plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Second, a plaintiff must show the defendant's response to the need was deliberately indifferent." *Conn*, 591 F.3d at 1094–95 (internal quotation marks and citation omitted). The "deliberate indifference" prong requires "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need, and (b) harm caused by the indifference." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006); *Conn*, 591 F.3d at 1095 (quoting *Jett*, 439 F.3d at 1096). "Indifference may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown in the way in which prison [officials] provide medical care." *Jett*, 439 F.3d at 1096 (citations and internal quotations marks omitted). "[T]he indifference to [a prisoner's] medical needs must be substantial. Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this [claim]." *Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (citing *Estelle v. Gamble*, 429 U.S.

97, 105–06 (1976)). Even gross negligence is insufficient to establish deliberate indifference to serious medical needs. *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990).

### 1. Sufficiently Serious Prong

Plaintiffs must show that St. Jovite had an objectively serious medical need. *Conn*, 591 F.3d at 1095. St. Jovite was found in his cell unconscious and not breathing. Defendants properly do not dispute that the medical need here was a serious one.

### 2. Deliberate Indifference Prong

Plaintiffs alleging an Eighth Amendment claim based upon the failure to provide medical treatment must also show that Defendants "were (a) *subjectively aware* of the serious medical need and (b) failed to adequately respond." *Conn*, 591 F.3d at 1096 (emphasis in original).

#### a. Cahoon and Holliday

The third watch floor officers, Cahoon and Holliday, were the first of the prison personnel to arrive at St. Jovite's cell. Drawing all inferences in favor of Plaintiffs, as we must, it could be found that St. Jovite's cellmate began yelling "man down" and "my cell[mate] hung himself" between 3:10 and 3:30 p.m. In response, Cahoon and Holliday generally went to St. Jovite's cell, opened the cell, discovered St. Jovite unconscious, and called a medical code 2 alarm. However, it is unclear from the record exactly what occurred during the time from when Cahoon and Holliday heard the "man down" call until Cahoon called a medical code 2 alarm at 3:40 p.m. Cahoon did order that Holliday get a cut-down kit and CPR

mask during that time, but it is unclear why he did so as St. Jovite's body was already on the floor when they arrived and both guards were required to carry CPR masks on their persons at all times.

MTA Hak, the first medical staff to respond to the call, did not arrive at the scene until 3:45 p.m., and when she did, both Cahoon and Holliday were standing near St. Jovite but not providing any aid. A jury could reasonably thus conclude that Cahoon and Holliday delayed administering aid to St. Jovite, while St. Jovite was unconscious, unresponsive, and purplish in color on the floor. Both Cahoon and Holliday (1) were informed that St. Jovite "hung himself," (2) observed a "noose" around his neck, and (3) attempted to speak to St. Jovite to get his attention. However, Cahoon called a medical code 2 and ordered Holliday to retrieve the cut-down kit and CPR mask from the control booth.

As other circuits have held, failing to provide CPR or other life-saving measures to an inmate in obvious need can provide the basis for liability under § 1983 for deliberate indifference. *See McRaven v. Sanders*, 577 F.3d 974, 983 (8th Cir. 2009) ("An officer trained in CPR, who fails to perform it on a prisoner manifestly in need of such assistance, is liable under § 1983 for deliberate indifference."); *Jones v. City of Cincinnati*, 521 F.3d 555, 560 (6th Cir. 2008) ("The complaint alleges that each of the officers present . . . knew that the handcuffed [prisoner] was not breathing. Therefore each knew of a substantial risk of serious harm to Jones's safety while he was in their custody and disregarded that risk by failing to provide aid."); *Bozeman v. Orum*, 422 F.3d 1265, 1273 (11th Cir. 2005) ("We also conclude that the Officers, who knew [the prisoner] was unconscious and not breathing and who then failed for fourteen minutes to check

[his] condition, call for medical assistance, administer CPR or do anything else to help, disregarded the risk facing [him] in a way that exceeded gross negligence."); *Tlamka v. Serrell*, 244 F.3d 628, 633 (8th Cir. 2001) ("[F]ailure to act given the patent nature of [the inmate's] condition, considering the officers' ability to provide CPR, is conduct sufficiently severe to evidence an Eighth Amendment violation.").

This court has previously held that officers' actions in failing to administer CPR to a prisoner did not necessarily amount to deliberate indifference. In *Cartwright v. City of Concord*, 856 F.2d 1437 (9th Cir. 1988), a pretrial detainee committed suicide while in city custody. Plaintiffs sued the officers and the city, arguing that the officers should have administered CPR during the five to seven minutes it took for the ambulance to arrive. *Id.* at 1438. We held that the officers were not deliberately indifferent because their "actions during the few intervening minutes between discovery of Cartwright – cutting him down, checking his vital signs, giving him aid – and the arrival of the emergency medical crews was not deficient." *Id.* (internal quotation marks omitted); *see also Maddox v. City of Los Angeles*, 792 F.2d 1408, 1415 (9th Cir. 1986) ("We have found no authority suggesting that the due process clause established an affirmative duty on the part of police officers to render CPR in any and all circumstances.").

The facts in the present case differ from those in *Cartwright* and *Maddox*, however. According to Plaintiffs' version of facts, Cahoon and Holliday did not fail to provide CPR because they were busy with other tasks. Instead, they allegedly took no life saving action while waiting for MTA Hak to arrive. While the failure to provide CPR to a prisoner in need does not create an automatic basis for liability in all circumstances, a trier of fact could conclude that, looking at

the full context of the situation, officers trained to administer CPR who nonetheless did not do so despite an obvious need demonstrated the deliberate indifference required for an Eighth Amendment claim.

### b. MTA Hak

MTA Hak was the first medical staff member at the scene. Arriving at St. Jovite's cell at 3:45 p.m., she testified that she checked for a pulse, observed that St. Jovite was purplish in color and that his feet were cold, and believed that he had gone into rigor mortis. MTA Hak then began applying an AED on St. Jovite when RN Hill arrived. The AED produced a flat line, and MTA Hak stepped aside to allow RN Hill to examine St. Jovite. RN Hill noted that St. Jovite had a purplish color on his face, chest, and right shoulder, found no pulse, and noted that his eyes were dilated. MTA Hak testified that according to these assessments, neither she nor RN Hill provided CPR because they believed St. Jovite beyond resuscitation. While this Court has held that it "may not affirm [a] district court's grant of summary judgment simply on the basis of the defendants' assertions as to their own state of mind," *Conn*, 591 F.3d at 1097 (quoting *Farmer*, 511 U.S. at 842), Plaintiffs have provided no evidence to contradict MTA Hak's statement that she believed St. Jovite could not be revived through CPR. Further, when MTA Hak arrived at the scene at 3:45 p.m., she did begin a medical assessment, which was still in progress when RN Hill arrived at approximately 3:48 p.m. This factual scenario is similar to that in *Cartwright*. MTA Hak's actions during the approximately three minutes between her arrival at the scene and the arrival of RN Hill, which included checking for a pulse, observing St. Jovite's physical appearance, and

applying an AED, did not constitute deliberate indifference to St. Jovite's condition. *See Cartwright*, 856 F.2d at 1438.

### c.   *Wade, Alcaraz, Wong, Martinez, and Orrick*

Plaintiffs argue that Defendants Wade, Alcaraz, Wong, Martinez, and Orrick, all of whom arrived after the first medical staff responded to the scene, acted with deliberate indifference because they violated the Dovey Memo, which required them to perform CPR and, although medical staff were to take primary responsibility, "[b]oth custody and medical personnel [were] responsible to continue life saving efforts in unison as long as necessary." Plaintiffs contend that whether the decision to defer to medical staff was reasonable is a question of fact for the jury. Nothing in the record, however, supports a claim that Wade, Alcaraz, Wong, Martinez, or Orrick "were (a) *subjectively aware* of the serious medical need and (b) failed to adequately respond." *Conn*, 591 F.3d at 1096. Instead, these Defendants were performing other functions, such as securing the scene or documenting the incident, that were reasonable in light of the fact that medical personnel were actively assessing St. Jovite's medical situation. It is not clear that their actions violated the CPR policy, but even if they did, the violations were not of a type that would tend to demonstrate deliberate indifference because they were reasonably relying on the actions of the medical responders who were already treating St. Jovite. We affirm the district court's grant of summary judgment as to these Defendants on the claim stemming from a failure to administer CPR. Wade, Alcaraz, Wong, Martinez, and Orrick did not act with deliberate indifference toward St. Jovite as they reasonably relied on the expertise of the prison's medical staff. *See, e.g.*, *Johnson v. Doughty*, 433 F.3d 1001, 1010–11 (7th Cir. 2006).

### 3. Causation

We analyze causation only with respect to Defendants Cahoon and Holliday in light of our holding that they are the only defendants that a jury could find to have been deliberately indifferent to St. Jovite's medical situation. Defendants argue that Plaintiffs have failed to establish that St. Jovite would have benefitted or survived if he had been provided CPR by one of the CSP-Solano officers. Three of the medical staff that arrived on the scene – MTA Hak, Noriega, and Hicks – determined that St. Jovite was beyond resuscitation.

Viewing the evidence in the light most favorable to Plaintiffs, however, a jury could reasonably determine that St. Jovite was alive and capable of being revived if CPR had been timely provided by Cahoon and Holliday. First, when the Vaca Valley Hospital paramedics arrived over twenty minutes after St. Jovite was discovered by Cahoon and Holliday, they immediately administered CPR, and continued to do so for almost twenty minutes before he was pronounced dead. A jury could conclude that, if the paramedics believed something could be done so long after St. Jovite was found unconscious and not breathing, starting CPR earlier might have had a benefit. Second, SRN Hicks testified that St. Jovite could have died any time between six and thirty minutes prior to the time she evaluated him. This suggests that if Cahoon or Holliday had started CPR immediately, which would have been anywhere between five to twenty-five minutes before SRN Hicks arrived at the scene, St. Jovite would not have been beyond revival at the time and therefore might have survived. Drawing all reasonable inferences in Plaintiffs' favor, a jury could conclude that had Cahoon and

Holliday provided CPR immediately, St. Jovite might have survived.

We therefore conclude that summary judgment should not have been granted with respect to the alleged failure of Defendants Cahoon and Holliday to provide medical care, but we affirm the grant of summary judgment as to all other Defendants on the medical care claims. Because there is a triable issue of fact as to whether Cahoon and Holliday were deliberately indifferent in failing to administer CPR and as to whether their failure to do so caused St. Jovite's death, there is also a triable issue of fact as to whether their actions rose to the conscience-shocking level required for a Fourteenth Amendment substantive due process violation. *Lewis*, 523 U.S. at 849–50.

## C. Failure to Train Staff

Plaintiffs allege that Carey and Tranquina should be held liable as supervisors for failing to properly implement and train the staff on the CPR policy. Plaintiffs note that MTA Hak and RN Hill had not been trained on the CPR policy, and that the custody officers were not aware of the requirement to work in unison with medical staff in providing CPR, as opposed to deferring to medical staff.

As noted above, a prison official in a supervisory position may be held liable under § 1983 if he was personally involved in the constitutional deprivation or a sufficient causal connection exists between his unlawful conduct and the constitutional violation. *Lolli*, 351 F.3d at 418. This causal connection can include: "1) [the supervisor's] own culpable action or inaction in the training, supervision, or control of subordinates; 2) their acquiescence in the

constitutional deprivation of which a complaint is made; or 3) [their] conduct that showed a reckless or callous indifference to the rights of others." *Cunningham*, 229 F.3d at 1292; *see Starr v. Baca*, 652 F.3d 1202, 1205–06 (9th Cir. 2011). "The requisite causal connection can be established by setting in motion a series of acts by others, or by knowingly refusing to terminate a series of acts by others, which the supervisor knew or should have known would cause others to inflict a constitutional injury." *Starr*, 652 F.3d at 1207–08 (internal quotation marks, alterations, and citations omitted).

Here, the evidence is undisputed that Carey and Tranquina complied with the order in *Coleman* and implemented a CPR policy at CSP-Solano. Plaintiffs have presented no evidence that either Carey or Tranquina were on notice that staff at CSP-Solano were not complying with the CPR policy, or that some staff were unaware of the policy. While at least two staff members, MTA Hak and RN Hill, were not trained on the policy until a day after St. Jovite died, there is no evidence that Carey or Tranquina knew or had reason to know of this lapse. *See Farmer*, 511 U.S. at 841 (supervisors liable only if on actual or constructive notice of the need to train).

Plaintiffs also argue that the training provided was deficient because it allowed custody staff to acquiesce to medical staff once on the scene. Plaintiffs have offered no evidence, however, that this interpretation of the Dovey Memo is impermissible. Nor do they show that Carey was deliberately indifferent in interpreting the policy in that way, requiring custodial staff to provide CPR to inmates but to allow medical staff to take primary responsibility once on the scene. We affirm the grant of summary judgment as to Carey and Tranquina on the failure to train claims.

## III.    Conclusion

We thus reverse with respect to the claim against Defendants Sisto and Neuhring for withdrawal of the floor officers and with respect to the claims based on the failure of Defendants Cahoon and Holliday to administer CPR. We conclude that there is a triable issue of fact as to whether Sisto and Neuhring were deliberately indifferent to St. Jovite's safety and welfare when one or both decided to convene two back-to-back staff meetings resulting in a lack of supervision in Building 8 for a period of up to three and a half hours. We also conclude that there is a triable issue of fact as to whether Cahoon and Holliday were deliberately indifferent to St. Jovite's potentially serious medical need when they failed to administer CPR prior to the arrival of prison medical staff. We affirm with respect to the remaining claims and defendants. We therefore vacate the summary judgment as to the aforementioned claims against Defendants Sisto, Neuhring, Cahoon, and Holliday, and remand for further proceedings. The parties will bear their own costs on appeal.

**AFFIRMED in part; VACATED and REMANDED in part.**