**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

JORGE ANDRADE RICO,
          *Plaintiff-Appellee*,

v.

CLARK E. DUCART, Warden; F. P.
MARULLI, Lieutenant at P.B.S.P.; D.
ABERNATHY, Sergeant at P.B.S.P.;
C. PARRY, P.B.S.P. Official;
J. CUSKE; NELSON; GARCIA;
ESCAMILLA; SHAVER,
          *Defendants-Appellants*,

and

JEFFREY A. BEARD, Secretary of
CDCR; MICHAEL STAINER; SCOTT
KERNAN; HARRINGTON; KATHLEEN
ALLISON, Warden,
          *Defendants.*

No. 19-15541

D.C. No.
2:17-cv-01402-
KJM-DB

OPINION

Appeal from the United States District Court
for the Eastern District of California
Kimberly J. Mueller, Chief District Judge, Presiding

Argued and Submitted July 14, 2020
San Francisco, California

Filed November 20, 2020

Before:  Richard C. Tallman and Danielle J. Hunsaker, Circuit Judges, and Roslyn O. Silver,[*] District Judge.

Opinion by Judge Tallman;
Partial Concurrence and Partial Dissent by Judge Silver

## SUMMARY[**]

### Prisoner Civil Rights

The panel reversed the district court's denial of qualified immunity to Pelican Bay officials in a civil rights action over prison noise stemming from the orders of a federal district court adopting recommendations of its Special Master to implement round-the-clock welfare checks to prevent inmate suicides in California's prison system.

Plaintiff alleged that the round-the-clock welfare checks disrupted his sleep and were conducted in a haphazard way. The panel held that the defendants were entitled to qualified immunity because, on the specific facts presented here, every reasonable official would not have understood that how they performed the court-ordered welfare checks violated the Constitution. Existing caselaw did not provide insight into the lawfulness of creating noise while conducting court-ordered suicide-prevention welfare checks

---

[*] The Honorable Roslyn O. Silver, United States District Judge for the District of Arizona, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

in a maximum security facility built of concrete, metal, and steel.

Even if Pelican Bay officials haphazardly implemented the welfare check system, no reasonable official in these circumstances would believe that creating additional noise while carrying out mandatory suicide checks for prisoner safety clearly violated plaintiff's constitutional rights. In circumstances like these, where the defendants were following court-ordered procedures to enhance inmate safety that were inherently loud, all Pelican Bay officials were entitled to qualified immunity from this civil rights suit.

Concurring in part and dissenting in part, Judge Silver concurred with the majority that the defendants who worked as floor officers during the day were entitled to qualified immunity. Judge Silver also concurred that the Warden was entitled to qualified immunity. As to the defendant who conducted the night checks and the supervisory defendants who took no remedial action after being informed that prisoners were denied sleep, Judge Silver stated that plaintiff's allegations described an obvious deprivation of a constitutional right, which was sufficient to survive a motion to dismiss.

---

**COUNSEL**

Heewon Heidi Seo (argued) and Jeffrey T. Fisher, Deputy Attorneys General; Neah Huynh, Supervising Deputy Attorney General; Monica N. Anderson, Senior Assistant Attorney General; Xavier Becerra, Attorney General; Office of the Attorney General, San Francisco, California; for Defendants-Appellants.

Kate S. Falkenstien (argued), Reichman Jorgensen LLP, Redwood Shores, California, for Plaintiff-Appellee.

---

**OPINION**

TALLMAN, Circuit Judge:

This civil rights action over prison noise stems from the orders of a federal district court adopting recommendations of its Special Master to implement round-the-clock welfare checks to prevent inmate suicides in California's prison system.   For purposes of qualified immunity, this interlocutory appeal requires us to address the reasonableness of actions taken by officials at California's Pelican Bay State Prison ("Pelican Bay") when carrying out the district court's orders.   We reverse the district court's denial of qualified immunity to the Pelican Bay officials because we conclude that no reasonable officer would have understood that these court-ordered actions were violating the constitutional rights of the inmates.

I

Jorge Andrade Rico is an inmate at Pelican Bay—the most secure among California's 33 prisons.   He was remanded to the Security Housing Unit ("SHU") inside the maximum security prison after attempting to murder another inmate, and his confinement in SHU is what subjected him to the court-directed Guard One welfare check system challenged in this litigation.

Guard One is the product of an ongoing class action, *Coleman v. Newsom, et al.*,[1] concerning mental health services provided to California Department of Corrections and Rehabilitation ("CDCR") inmates. As part of that class action, the *Coleman* court appointed a Special Master to "monitor compliance" with injunctive relief. *Coleman v. Wilson*, 912 F. Supp. 1282, 1324 (E.D. Cal. 1995).[2]

In the late 2000's, the *Coleman* court issued a series of orders requiring CDCR officials to implement certain measures to reduce inmate suicides in solitary confinement cells. *See Coleman v. Schwarzenegger*, 922 F. Supp. 2d 882, 902 n.19 (E.D. & N.D. Cal. 2009). Since 2013, these measures included directives to correctional officers to conduct welfare checks on inmates in Security Housing Units every half hour. To ensure that prison officials conducted these welfare checks at the required frequency, the Guard One system was implemented in 2014 at some state prisons. The system functions like a time clock for night watchmen. Every half hour, an officer must touch the end of a hand-held metal "pipe" or "wand" to a metal disc attached to each cell door as the officer peers inside to assess the inmate's welfare. The wand triggers a sound confirming that the tracking system has electronically recorded the time of the observation. This tracking data is reviewed daily to verify that correctional officers are completing the required welfare checks every half hour.

---

[1] Case No. 2:90-cv-0520-KJM-DB (E.D. Cal.).

[2] Because the *Coleman* Special Master's reports are court filings, it is appropriate to take judicial notice of them. *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006). Accordingly, Defendants' request for judicial notice is granted.

Because of Pelican Bay's unique physical structure, it did not install Guard One in 2014. But the Special Master nonetheless recommended that Guard One be implemented at Pelican Bay to address a lack of data demonstrating compliance with the required welfare checks. In February 2015, the *Coleman* court adopted the recommendations of the Special Master by ordering the system be implemented, *Coleman v. Brown*,[3] and Pelican Bay started using Guard One in the SHU on August 3, 2015.

Compared to Guard One's use in other CDCR prisons, conducting the checks creates more noise at Pelican Bay because of the building's circular design.[4] While many other CDCR facilities are arranged along a straight hall, Pelican Bay's SHU contains six pods arranged around a circular core. The door to each pod is made of metal. Inside each pod, two floors of four cells line one side of the pod. Metal stairs connect the two floors of cells on the other side. The door to each cell is also made of metal.

Each time a pod door opens and closes, the door makes a loud noise for approximately twelve seconds. When the door fully closes, it makes a loud sound that resonates through the walls. Inmates can hear the doors of all six pods opening and closing. As the officers conduct their rounds, inmates can also hear the noise of the officers' boots on the metal stairs and the metal-on-metal noise of the wands

---

[3] Case No. 2:90-cv-0520-KJM-DAD, Doc. 5271 (E.D. Cal. Feb. 3, 2015).

[4] Because we accept as true all well-pleaded allegations of material fact at the motion to dismiss stage, we state all of the facts taken from his complaint in the light most favorable to Rico. *See Hernandez v. City of San Jose*, 897 F.3d 1125, 1131–32 (9th Cir. 2018).

hitting the discs on every cell in their own pod and the two neighboring pods.

## A

Rico experienced this noise from the time Guard One was implemented at Pelican Bay on August 3, 2015, until he was released from the SHU on August 23, 2016. Each round of Guard One checks took approximately 15 minutes to complete, so the inmates initially had only 15 minutes of uninterrupted time between rounds. This was adjusted to 45 minutes between rounds after December 28, 2015, when the *Coleman* court approved the parties' stipulation to reduce the welfare checks to once per hour at night "because of the unique design of . . . Pelican Bay." *Coleman v. Brown*.[5] Accordingly, Rico had 45 minutes per hour of uninterrupted time between the hours of 10:00 p.m. and 6:00 a.m. until he was released back into less restrictive confinement on August 23, 2016.

## B

On August 9, 2015, Rico joined other inmates in filing a group administrative grievance about the noise generated by Guard One during First Watch (10:00 p.m. to 6:00 a.m.). The inmates asked Pelican Bay officials to use a different system for the welfare checks, to leave pod doors unlocked and slightly open, and to make as little noise as possible when conducting the checks. On August 20, 2015, Pelican Bay's Warden, C.E. Ducart, denied the inmates' request to use an alternative system because the inmates did not provide any proof that the current welfare checks were

---

[5] Case No. 2:90-cv-0520-KJM-DAD, Doc. 5393 (E.D. Cal. Dec. 28, 2015).

ineffective. Ducart also denied the request to leave pod doors open as it would be a safety and security hazard. Finally, Ducart granted in part the inmates' request, directing staff to try to make as little noise as possible on First Watch.

Between August 9, 2015, and December 20, 2015, Rico individually filed five Form 22 requests[6] asking for officers "to hit the metal buttons more quietly[,] . . . to leave the pod doors open while conducting the checks," and to put tape or rubber on the pipes to reduce noise. Rico's requests also claimed that the noise was harming his mental and physical health and asked both for staff to reduce the noise and for the Facility Captain to fix Rico's door to reduce noise.

Sergeant Abernathy responded to four of Rico's requests, stating that staff were "looking into ways to reduce the noise," suggesting earplugs, and denying Rico's requests to leave the pod doors open. After Rico requested supervisory review of these responses, Lieutenant Marulli responded that staff were attempting to "keep the noise to a minimum" and had "no control over the amount of noise the door makes." In response to Rico's request to have the door fixed because it was affecting his mental and physical health, Sergeant Cuske responded that he would refer Rico for a mental health visit. When Rico requested higher level review because a mental health visit would not solve the problems stemming from excessive noise, Officer Parry responded that Rico could file an administrative appeal.

---

[6] A Form 22 is a "request for interview, item, or service." It is known colloquially as a "kite" in prison settings. *See Richey v. Dahne*, 807 F.3d 1202, 1205 n.3 (9th Cir. 2015).

C

On August 2, 2016, Rico instead filed a pro se civil rights lawsuit in the Northern District of California under 42 U.S.C. § 1983.  Pro bono counsel later filed a Second Amended Complaint, which alleged an Eighth Amendment condition-of-confinement claim for sleep deprivation caused by excessive noise, against fourteen Defendants: the nine Defendants on appeal as well as five past and present Secretaries of CDCR and Directors of the Division of Adult Institutions of CDCR.  Rico's claims against the five Secretaries and Directors alleged that the Guard One System itself was unconstitutional, even if implemented without any human error.  Rico alleged that Warden Ducart, Lieutenant Marulli, Sergeant Abernathy, Sergeant Cuske, and Officer Parry ("the supervisory officials") were responsible for supervising operations and were deliberately indifferent to his sleep deprivation in their responses to his administrative grievances about the Guard One System.

Rico also brought claims against four correctional officers: Officer Nelson, who worked the First Watch (10:00 p.m. to 6:00 a.m.), Officer Garcia, who worked the Second Watch (6:00 a.m. to 2:00 p.m.), and Officers Escamilla and Shaver, who worked the Third Watch (2:00 p.m. to 10:00 p.m.) ("the floor officers").  Rico alleged that the officers made "extra noise by conducting the Guard One checks haphazardly."  This haphazard conduct consisted of running loudly on the metal stairs, hitting the discs with more force than necessary, and hitting the disc at each cell multiple times.  Rico claimed that this noise deprived him of sleep, which caused medical problems and prevented him from concentrating during the day.

The Northern District of California sua sponte transferred the case to the Eastern District, where it was

deemed related to *Coleman* and assigned to the *Coleman* case district judge.  Defendants moved to dismiss, arguing that they were entitled to qualified immunity because a reasonable officer would not be aware that complying with the *Coleman* court's order to execute the Guard One checks would violate Rico's constitutional rights.  The magistrate judge recommended granting qualified immunity to the five Secretaries and Directors but denying qualified immunity to the supervisory officials and the floor officers.

The district court adopted the magistrate judge's report and recommendations and granted qualified immunity to the five Secretaries and Directors because they were carrying out a facially valid court order in implementing the Guard One system.**[7]**  The district court denied qualified immunity to the remaining nine defendants, finding that Rico had a clearly established right to be free from sleep deprivation caused by excessive noise.  In denying qualified immunity to the five supervisory officials, the district court found that "it was unconstitutional to ignore an inmate's complaint detailing such allegations."  Regarding the four floor officers, the district court reasoned that "a reasonable officer would have known it was unlawful to create a racket" in executing the Guard One system.

The remaining nine defendants, the supervisory officials and the floor officers, timely appealed the district court's denial of qualified immunity.  We have jurisdiction under 28 U.S.C. § 1291.  *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).  We now reverse.

---

**[7]** That ruling is not challenged on appeal.

## II

We review de novo a denial of a motion to dismiss based on qualified immunity, accepting as true all well-pleaded allegations of material fact. *Hernandez v. City of San Jose*, 897 F.3d 1125, 1131–32 (9th Cir. 2018) (citations omitted).

## III

Qualified immunity shields government officials under § 1983 unless "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). We may exercise our discretion in deciding which of the two prongs to address first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (quoting *Reichle*, 566 U.S. at 664). While we do not require a case on all fours, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (citations omitted). Qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Wesby*, 138 S. Ct. at 589 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

We must consider "whether the violative nature of [the defendants'] *particular* conduct is clearly established . . . in light of the *specific context* of the case." *Hamby v. Hammond*, 821 F.3d 1085, 1091 (9th Cir. 2016) (alteration in original) (quoting *Mullenix*, 577 U.S. at 12). The Supreme

Court has made clear that we must consider the "specific facts under review." *Id.* at 1090; *see City & County of San Francisco v. Sheehan*, 575 U.S. 600, 135 S. Ct. 1765, 1775–76 (2015) ("We have repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality." (quoting *al-Kidd*, 563 U.S. at 742)).

With these principles in mind, we review whether the supervisory officials and floor officers are entitled to qualified immunity in this case.  We conclude that they are.

### A

Existing precedent does recognize *general* rights against excess noise and prison conditions that deprive inmates of "identifiable human need[s]," such as sleep.  *See Wilson v. Seiter*, 501 U.S. 294, 304 (1991); *accord Keenan v. Hall*, 83 F.3d 1083, 1090–91 (9th Cir. 1996), *opinion amended on denial of reh'g*, 135 F.3d 1318 (9th Cir. 1998) (holding "the Eighth Amendment require[s] that [inmates] be housed in an environment . . . reasonably free of excess noise" and denying summary judgment for prison officials on claims related to constant noise from other inmates and constant illumination alleged to be causing sleeping problems); *see also Walker v. Schult*, 717 F.3d 119, 122, 126 (2d Cir. 2013) (finding an inmate plausibly alleged an Eighth Amendment violation for sleep deprivation caused by his five cellmates making constant and loud noise inside the cell all night); *Harper v. Showers*, 174 F.3d 716, 717, 720 (5th Cir. 1999) (finding that "[c]onditions designed to prevent sleep . . . might violate the Eighth Amendment" when an inmate alleged sleep deprivation because of noise caused by other inmates); *Antonelli v. Sheahan*, 81 F.3d 1422, 1433 (7th Cir. 1996) (not addressing qualified immunity but finding that an inmate stated a cognizable Eighth Amendment claim when

noise "occurred every night, often all night"). But this is not the end of the analysis; we must consider the "specific facts under review" here. *Hamby*, 821 F.3d at 1090.

## B

We go straight to the second prong of the qualified immunity analysis: whether existing precedent placed the question "beyond debate" that every reasonable official would have understood that his specific actions violated a clearly established right. *Id.* at 1092. Rico alleges that creating excessive noise that deprives inmates of sleep for an extended period is a clearly established constitutional violation. However, the defendants in this case are entitled to qualified immunity because, on the specific facts presented here, every reasonable official would not have understood that how they performed the court-ordered Guard One checks violated the Constitution. *See id.* at 1090.

Our mandate to examine the particular facts, including what caused Rico's alleged sleep deprivation, reveals that the challenged noise arose from activity that was inherently noisy in a facility the very construction of which made difficult quietly conducting round-the-clock welfare checks that defendants were ordered by the *Coleman* court to perform.[8] Rico suggests that we need not focus on the factual specificity of precedent because the qualified immunity inquiry in Eighth Amendment cases differs from the inquiry in other types of cases, like those involving the

---

[8] The dissent suggests that these facts are not properly before us at the motion to dismiss stage, but Rico's detailed factual allegations lay the blame for much of the noise on Pelican Bay's circular design. Dissent at 29–30. Moreover, we have taken judicial notice of a court order acknowledging the noise that Guard One produced because of "the unique design of Pelican Bay."

Fourth Amendment.  But we have clarified "that the fact-specific, highly contextualized nature of the inquiry does not depend on which particular constitutional right a given plaintiff claims the officials have violated."  *Id.* at 1091.

Existing caselaw did not provide insight into the lawfulness of creating noise while conducting court-ordered suicide-prevention welfare checks in a maximum security facility built of concrete, metal, and steel.  Rico relies upon a single Ninth Circuit published opinion in *Keenan*.  83 F.3d at 1090.  But even a cursory review of the facts in *Keenan* reveals how different that case is from this one: *Keenan* involved unrelenting noise caused by other inmates.

In *Keenan*, we held that, while an inmate does not have a right to a quiet environment, an inmate does have a right to an environment that is "reasonably free" from constant, excessive noise caused by other inmates.  *See id.* (finding a right to be free from excessive noise caused "at all times of day and night [by other] inmates . . . screaming, wailing, crying, singing, and yelling, often in groups").  That case did not put "beyond debate" the lawfulness of periodic noise resulting from court-ordered suicide-prevention checks and the immutable characteristics of a solitary confinement unit deliberately constructed in a maximum security prison not conducive to these kinds of activities.

Rico also relies on cases about sleep deprivation caused by constant illumination, but none of these cases involve suicide-prevention checks or inherently noisy and recurring action ordered by a court.  *Keenan* found that an inmate had stated a separate Eighth Amendment claim for being subjected to constant illumination with no legitimate penological purpose, *id.* at 1090–91, and an unpublished case echoed this.  *Jones v. Neven*, 399 F. App'x 203, 204–05 (9th Cir. 2010) (denying qualified immunity when prison

officials forced an inmate to sleep on a cell floor with constant illumination and noise from a light fixture); *but see Chappell v. Mandeville*, 706 F.3d 1052, 1057–58 (9th Cir. 2013) (granting qualified immunity where there was a legitimate penological purpose for constant illumination). *Grenning v. Miller-Stout* found that constant illumination can violate the Eighth Amendment but noted that the district court might find that the prison officials were entitled to qualified immunity on remand. 739 F.3d 1235, 1238–39, 1241 (9th Cir. 2014). In contrast to constant illumination not mandated by a court, the Pelican Bay officials were carrying out a court order designed to benefit at-risk inmates that caused frequent, but not constant, sound.[9]

Rico also relies on cases from other circuits, but again, these cases do not address the specific circumstances faced here by the Pelican Bay officials. *See Walker*, 717 F.3d at 122, 126 (finding an inmate plausibly alleged an Eighth Amendment violation for sleep deprivation caused by his five cellmates making constant and loud noise inside the cell all night); *Harper*, 174 F.3d at 717, 720 (finding that "[c]onditions designed to prevent sleep . . . might violate the Eighth Amendment" when an inmate alleged sleep

---

[9] The dissent suggests that the facts in this case are as extreme as those present in the Supreme Court's recent decision in *Taylor v. Riojas*, No. 19-1261, 2020 WL 6385693, at *1 (U.S. Nov. 2, 2020) (per curiam), such that no reasonable officer could believe the implementation of the Guard One system was lawful. This is incorrect, if for no other reason than the Guard One system, unlike Taylor's placement in "deplorably unsanitary conditions," was implemented by a court order intended to protect inmates from harm. Moreover, *Taylor* confirms that an officer is entitled to qualified immunity if she "reasonably misapprehends the law governing the circumstances she confronted." *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)). This principle clearly applies here given the *Coleman* court's orders and Pelican Bay's "unique design."

deprivation because of noise caused by other inmates); *Antonelli*, 81 F.3d at 1433 (not addressing qualified immunity but finding that an inmate stated a cognizable Eighth Amendment claim when noise "occurred every night, often all night").  While these cases suggest that prison officials need to regulate incessant noise caused by other inmates, they do not provide guidance to a reasonable prison official carrying out a court-ordered activity that is inherently noisy.

Rico also relies on unpublished district court decisions. While "unpublished decisions of district courts may inform our qualified immunity analysis . . . it will be a rare instance in which, absent any published opinions on point or overwhelming obviousness of illegality, we can conclude that the law was clearly established on the basis of unpublished decisions only." *Sorrels v. McKee*, 290 F.3d 965, 971 (9th Cir. 2002).  "Indeed, common to cases in which qualified immunity is unavailable is that 'the issue . . . has been litigated extensively and courts have consistently recognized' the right at issue." *Id.* (omission in original) (quoting *Malik v. Brown*, 71 F.3d 724, 729–30 (9th Cir. 1995)).  This is not that rare instance.

The specific facts of these cases fail to establish the specific right advanced here beyond debate, and the single published opinion in *Keenan*, repeated in one unpublished disposition, combined with the other three cases from our sister circuits about constant illumination, cannot form the basis for a "robust consensus."  *See Wesby*, 138 S. Ct. at 589–90 (stating that we must look first to binding precedent, then we may consider a "robust consensus of cases of persuasive authority"); 9th Cir. R. 36-3(a) (unpublished dispositions are not precedential).

## C

Rico argues that the *Coleman* court order does not make the Pelican Bay officials' implementation of Guard One lawful. Of course, a court order does not give carte blanche to prison officials. "[S]ome things are so obviously unlawful that they don't require detailed explanation and sometimes the most obviously unlawful things happen so rarely that a case on point is itself an unusual thing." *Hines v. Youseff*, 914 F.3d 1218, 1230 (9th Cir. 2019) (citation omitted). However, the Pelican Bay officials carrying out the *Coleman* court order can hardly be considered to fall into this category of obvious unlawfulness.

Moreover, because the Pelican Bay officials implemented Guard One at the behest of the *Coleman* court and under the supervision of its Special Master, these circumstances play a major role in determining what "reasonable official[s] in [the defendants'] shoes would have understood" about what they were commanded to do, how that would impact a prisoner's rights, and whether they were violating those rights. *See Sheehan*, 135 S. Ct. at 1774 (citation omitted). Even viewing Rico's allegation as true that the floor officers improperly implemented Guard One, causing extra noise by running on the metal stairs, hitting the Guard One discs with more force than necessary, and rushing through checks, it is not "beyond debate" that every reasonable floor officer would be aware that this conduct violated the law. *See Taylor v. Barkes*, 575 U.S. 822, 135 S. Ct. 2042, 2044–45 (2015) (per curiam) (although evidence showed the suicide screening process did not comply with standards, no existing precedent established a right to the proper implementation of suicide prevention protocols).

According to Rico's allegations, much of the noise that kept him awake resulted from the design of the Pelican Bay

SHU and use of the Guard One system in and of itself—not the allegedly haphazard implementation of that system by the floor officers.[10]  Rico blames much of the noise on the metal doors of the pods, the metal-on-metal contact of the Guard One wands with the metal discs, the metal staircases, and the circular design of Pelican Bay's SHU.  He alleges that the layouts of SHUs in other facilities are quieter, so inmates do not hear as many pod doors opening and closing, the metal pipes hitting the metal discs on as many cells, officers who must use metal staircases within the pods, and the same degree of reverberation with the cell walls.  While the officers may have made extra noise by rushing to complete the checks, the officers were undoubtedly and unavoidably going to make noise simply by complying with the court-mandated use of the Guard One system within the SHU at Pelican Bay.  Pelican Bay's circular layout required the floor officers to travel up and down the metal stairs to check the inmates confined on the lower and upper levels of the pods.  Assuming perfect implementation of the system, inmates were still susceptible to being awoken every hour each night when heavy entry doors to the pods opened and closed.

---

[10] The injunctive relief initially sought by Rico in the district court reveals Rico's awareness that the noise inherent in the unique design of the prison and the court-ordered checks caused his alleged sleep deprivation.  Rather than requesting the guards to execute the court-ordered checks more quietly, Rico asked to relocate the Pelican Bay SHU to a facility with a less disruptive layout, to reduce the frequency of the checks to every two hours, to develop a quieter system utilizing non-metal surfaces, to alter the doors to reduce the amount of noise caused by officers' entries and exits from the pods, and to provide earplugs that could fully block the noise of the welfare checks.  These requests were denied as moot by the district court as Rico was no longer in the SHU and are not before us on appeal.

Rico argues that dismissal at this stage is inappropriate because discovery is necessary to address factual questions including whether the checks were too loud for the inmates to sleep, whether officers caused noise through their "sloppy implementation of the checks," and whether the officers "were doing the best they could under the circumstances." We need not wait for the summary judgment stage; even taking every fact Rico pleads as true, under these circumstances, no reasonable officer would believe that creating additional noise while carrying out mandatory suicide checks for prisoner safety clearly violated Rico's constitutional rights. *See Hines*, 914 F.3d at 1231 ("[N]o reasonable prison official would understand that executing a court order without investigating its potential illegality would violate [a] prisoner's right to be free from cruel and unusual punishment." (citation omitted)).

Assuming that the officers created extra noise by rushing to complete checks, this action was, at most, a reasonable mistake. *See Saucier v. Katz*, 533 U.S. 194, 205 (2001) ("The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular . . . conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts."). The initial court order required officers to conduct the checks twice an hour; thus, the officers had to move quickly. Moreover, the Guard One system itself was intended to ensure prison officials complied with the required frequency of the checks; reasonable officers might touch the metal disc more than once if they were not sure if the first touch had been recorded. A reasonable guard could be uncertain whether it was better to rush to complete checks—making more noise for a shorter period of time—or

to more slowly complete checks—making less noise for a longer period of time.**[11]**

Qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Wesby*, 138 S. Ct. at 589 (quoting *Malley*, 475 U.S. at 341). Even if the floor officers created some extra noise in implementing Guard One, they are entitled to qualified immunity as their actions fell "within that vast zone of conduct that is perhaps regrettable but is at least arguably constitutional." *Hamby*, 821 F.3d at 1095.

## D

Supervisory prison officials may be liable under § 1983 if they were "personally involved in the constitutional deprivation or a sufficient causal connection exists between [their] unlawful conduct and the constitutional violation." *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1085 (9th Cir. 2013) (citation omitted). This causal connection can be established by "knowingly refusing to terminate a series of acts by others, which the supervisor[s] knew or should have known would cause others to inflict a constitutional injury." *Id.* (quoting *Starr v. Baca*, 652 F.3d 1202, 1207–08 (9th Cir. 2011)) (affirming a grant of summary judgment to supervisory prison officials on a prisoner's § 1983 claim about a failure to train staff when the

---

**[11]** The dissent claims that we have added new facts in analyzing the reasonableness of the officers' actions, but the reasonableness of an officer's action is a legal question to be decided by the court. While we take all of Rico's factual allegations as true, we, not Rico, decide the objective reasonableness of an officer's actions. *See al-Kidd*, 563 U.S. at 734, 743 (taking as true the factual allegations in the complaint but granting qualified immunity at the motion to dismiss stage).

evidence was undisputed that the officials were complying with a *Coleman* court order).

As discussed above, no reasonable official would believe that creating additional noise while carrying out mandatory suicide checks for prisoner safety clearly violated Rico's constitutional rights. Rico acknowledged that the supervisory officials offered mental health referrals and provided earplugs. The supervisory officials had no reason to believe that carrying out the *Coleman* court's orders would cause the floor officers "to inflict a constitutional injury." Warden Ducart, Lieutenant Marulli, Sergeant Abernathy, Sergeant Cuske, and Officer Parry are entitled to qualified immunity.

IV

Even if the Pelican Bay officials haphazardly implemented the Guard One system, no reasonable official in these circumstances would believe that creating additional noise while carrying out mandatory suicide checks for prisoner safety clearly violated Rico's constitutional rights. In circumstances like these, where the defendants were following court-ordered procedures to enhance inmate safety that are inherently loud, all Pelican Bay officials are entitled to qualified immunity from this civil rights suit.

That portion of the district court's order denying qualified immunity on Rico's Eighth Amendment claim is **REVERSED** and the case is **REMANDED** for entry of an order of dismissal granting qualified immunity as to all remaining defendants.

SILVER, District Judge, concurring in part and dissenting in part:

I respectfully concur in part and dissent in part.

I

I concur with the majority that Defendants Garcia, Escamilla, and Shaver, who worked as floor officers during the day, are entitled to qualified immunity. Rico's allegations are the Guard One system "prevent[ed] [him] from concentrating during the day."[1] Thus, he has "failed to demonstrate that [the day-shift guards] were personally involved in any Eighth Amendment violations." *Hines v. Youseff*, 914 F.3d 1218, 1228 (9th Cir. 2019).

And I concur that Ducart, the Warden, is entitled to qualified immunity. Rico did not allege that Ducart had knowledge, after his August 20, 2015 response to the group grievance, that prison staff were disobeying his order to "make as little noise as possible on 1st Watch."

II

The district court correctly denied qualified immunity to Defendant Nelson, who conducted the Guard One checks at night, and to the supervisory Defendants who, after being informed that prisoners were being denied sleep, took no remedial action. Thus, for those Defendants, I dissent.

My difference with the majority rests primarily on the procedural posture. The district court considered and denied a motion to dismiss, which requires on appeal that all well-

---

[1] Rico does not allege noise during the day deprived him of sleep, and, on appeal, the focus is on the excessive noise at night.

pleaded factual allegations in the complaint be accepted as true and viewed in the light most favorable to the plaintiff.[2] *Kroessler v. CVS Health*, 977 F.3d 803 (9th Cir. 2020); *see Curtis v. Irwin Indus.*, 913 F.3d 1146, 1151 (9th Cir. 2019); *Hernandez v. City of San Jose*, 897 F.3d 1125, 1131–32 (9th Cir. 2018); *see also Bell Atl. v. Twombly,* 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The first prong of the qualified immunity analysis requires determining whether, based on the facts alleged in the complaint, Rico suffered a deprivation of a constitutional or statutory right. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (citation omitted). The majority did recount facts alleged in the complaint, but for my analysis certain facts require emphasis.[3]

According to the complaint, from August 3, 2015 through August 23, 2016, Rico was housed in the SHU and subject to the noise created by the Guard One system that allegedly caused the pod doors to open and close creating "a loud noise." But significant for Rico's claim, additional excessive noise was generated by the manner in which guards completed their required tasks. Rico clearly alleges (1) the guards "ran loudly up and down the metal stairs"; (2) "hit the Guard One buttons with more force than necessary"; and (3) "regularly rushed through the pods too quickly to hit the Guard One buttons accurately, causing them to attempt to hit the Guard One button on each cell multiple times, making extra unnecessary noise." And when

---

[2] It may be that all Defendants are determined to be entitled to qualified immunity at summary judgment or trial.

[3] It is noteworthy that the complaint is unusually detailed, providing more than thirty factual allegations.

Rico filed complaints regarding the noise generated by Guard One, the supervisory defendants provided "assurances that they were looking into ways to reduce the noise" but "no actions [were] taken to make the Guard One checks any quieter." In other words, Rico alleges guards created far more noise than necessary, and, when Rico complained, the supervisory personnel declined to resolve it.

The first prong of qualified immunity analysis asks "whether the official's conduct violated a constitutional right." *Hines*, 914 F.3d at 1218. As the majority recognized, prisoners are entitled to "identifiable human need[s], such as sleep." (Majority at 12). Therefore, conditions of confinement depriving prisoners of sleep for an extended period violate the Constitution. According to the complaint, Rico was deprived of sleep for over a year, which establishes a viable claim for an Eighth Amendment violation.

## III

The second prong of the qualified immunity analysis requires determining whether every reasonable official would have known that depriving Rico of sleep for a year violated his rights.

We have made clear both excessive noise and conditions causing sleep deprivation violate the Eighth Amendment. In *Keenan v. Hall*, the inmate challenged several of the conditions of his confinement that lasted six months, including constant illumination that caused "grave sleeping problems," and excessive noise ("constant, loud banging" "at all times of day and night"). 83 F.3d 1083, 1087–88, 1090–91 (9th Cir. 1996), *opinion amended on denial of reh'g*, 135 F.3d 1318 (9th Cir. 1998). We first held that "public conceptions of decency inherent in the Eighth Amendment require that [inmates] be housed in an

environment that, if not quiet, is at least reasonably free of excess noise." *Id.* (quoting *Toussaint v. McCarthy*, 597 F. Supp. 1388, 1410 (N.D. Cal. 1984) *aff'd in part, rev'd in part on other grounds*, 801 F.2d 1080, 1110 (9th Cir.1986), *cert. denied*, 481 U.S. 1069 (1987)); *see also Toussaint*, 597 F. Supp. at 1398 (noting that "[n]oise contributes to the great difficulty many [inmates] experience in sleeping" and "adversely affects . . . mental health").

Next, we affirmed there is "no legitimate penological justification for requiring [inmates] to suffer physical and psychological harm by living in constant illumination," in this case causing "grave sleeping problems." *Keenan*, 83 F.3d at 1090–91 (citation and internal quotation marks omitted). Like constant illumination, courts have recognized noise that occurs at night, thereby depriving a person of sleep, causes greater harm than noise that occurs during the day. *Antonelli v. Sheahan*, 81 F.3d 1422, 1433 (7th Cir. 1996) (finding allegations of "excessive noise" occurring "every night, often all night, interrupting or preventing [plaintiff's] sleep," stated a Due Process or Eighth Amendment claim); *see generally Bravman v. Baxter Healthcare Corp.*, 984 F.2d 71, 75 n.3 (2d Cir. 1993) ("The gravity of the harm from noises that disturb a person's sleep, for example, is ordinarily much greater when the noises occur at night than it is when the noises occur in the daytime.") (quoting Restatement (Second) of Torts § 827 cmt. b (1979)).

The right to adequate sleep, a well-recognized human need, is also established by persuasive authority. As the majority notes, a right may be clearly established by "a robust consensus of cases of persuasive authority." *Wesby*, 138 S. Ct. at 589–90. Our sister circuits have not often decided cases involving sleep deprivation, but every circuit

that has held that conditions of confinement depriving inmates of sleep violate the Eighth Amendment. *Walker v. Schult*, 717 F.3d 119, 126 (2d Cir. 2013) ("[S]leep is critical to human existence, and conditions that prevent sleep have been held to violate the Eighth Amendment."); *Harper v. Showers*, 174 F.3d 716, 720 (5th Cir. 1999) ("[S]leep undoubtedly counts as one of life's basic needs. Conditions designed to prevent sleep, then, might violate the Eighth Amendment."); *see Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 374 (3d Cir. 2019) (holding denial of "sufficient sleep" could violate the Eighth Amendment); *Walton v. Dawson*, 752 F.3d 1109, 1120 (8th Cir. 2014) (noting "the Constitution guarantees a minimum right to sleep").

The majority, however, has narrowed the "clearly established" prong to determine whether "[e]xisting caselaw" addresses "the lawfulness of creating noise while conducting court-ordered suicide-prevention welfare checks in a maximum security facility built of concrete, metal, and steel." (Majority at 14). This approach is functionally equivalent to requiring "a case directly on point," something the Supreme Court has rejected. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Thus, while identifying the appropriate "level of generality" for existing precedent can be difficult, a greater level of generality is required here. *Id.*

I agree that this inquiry requires considering if existing precedent establishes the "violative nature of . . . *particular* conduct . . . in light of the *specific context* of the case." *Hamby v. Hammond*, 821 F.3d 1085, 1091 (9th Cir. 2016) (citation omitted) (emphasis in original). However, the clearly established prong of qualified immunity must be applied in a reasonable fashion, preventing liability where genuine uncertainty exists but allowing liability where no

reasonable official could actually be confused. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Basic and clearly necessary requirements, such as sleep, are not subject to debate.[4] *See Rhodes v. Chapman*, 452 U.S. 337, 347 (1981) (holding that prisoners are entitled to "the minimal civilized measure of life's necessities"). The majority does not dispute that sleep is one of life's necessities. (Majority at 12).

Our case law regarding providing adequate nutrition is analogous. In *Foster v. Runnels*, 554 F.3d 807, 810 (9th Cir. 2009), a guard failed to provide a prisoner his meals because the prisoner refused to remove paper blocking the back window of his cell. *Id.* The guard's supervisors had issued a "memo" stating any prisoner who refused to unblock cell windows could be denied meals. *Id.* at 811. After the prisoner sued the guard for denying him food, the district court granted qualified immunity at summary judgment. *Id.* In conducting the "clearly established" analysis, we began by noting "[t]here is no question that an inmate's Eighth Amendment right to adequate food is clearly established." *Id.* at 815. We held, "[t]he decisions from this Circuit and others alerting prison officials of their obligations to provide inmates with nutritionally adequate meals on a regular basis should have given [the guard] sufficient notice of the contours of the Eighth Amendment right." *Id.* Even though a "memo" allegedly authorized the guard's actions, it was held that the memo was never an official policy and, in any

---

[4] In contrast, whether a hernia should be treated surgically or non-surgically, no reasonable prison official could be confused whether prisoners are entitled to adequate sleep. *Hamby v. Hammond*, 821 F.3d 1085, 1094 (9th Cir. 2016) (granting qualified immunity at summary judgment to prison officials who opted for non-surgical treatment of hernia). Moreover, *Hamby* was decided on summary judgment, which included additional fact-finding beyond the complaint. *Id.* at 1090.

event, the guard's "conduct was not reasonable because she took no other action to ensure that her obligation to provide [the prisoner] with meals was met." *Id.* Thus, when a prison official's behavior, according to the complaint, deprives a prisoner of such a basic need, the "clearly established" inquiry is met.

In *Foster*, we did not adopt the majority's position that a prisoner is required to point to case law that establishes the unlawfulness of depriving an inmate of food under the particular circumstances in that case. *See Torres v. City of Madera*, 648 F.3d 1119, 1129 (9th Cir. 2011) (quoting *Hope*, 536 U.S. at 741) ("requir[ing] such a granular specificity . . . effectively wrench[es] . . . all meaning [from] the Supreme Court's admonition that 'officials can still be on notice that their conduct violates established law even in novel factual circumstances.' "); *see also Hope*, 536 U.S. at 741 (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)) ("general statements of the law are not inherently incapable of giving fair and clear warning"); *Hardwick v. Cty. of Orange*, 844 F.3d 1112, 1117 (9th Cir. 2017). Where essential rights, such as food or sleep, are deprived, every reasonable prison official has "sufficient notice of the contours" of that right, even in idiosyncratic circumstances. *Foster*, 554 F.3d at 816.

A very recent Supreme Court case supports this point. In *Taylor v. Riojas*, the inmate spent six days between two cells: one covered in massive amounts of feces and the other frigidly cold with a clogged drain overflowing with raw sewage. No. 19-1261, 2020 WL 6385693, at *1 (U.S. Nov. 2, 2020) (per curiam). Finding the inmate had an obvious right to be free from "deplorably unsanitary conditions," the Supreme Court reversed the Fifth Circuit's grant of qualified immunity on summary judgment rejecting that " '[t]he law

wasn't clearly established' " because of " 'ambiguity in the caselaw.' " *Id.* at *1, *2 n.2 (citation omitted). Instead, the Court held the prisoner's rights were so obvious that "ambiguity in the caselaw" could not create any doubt. *Id.* at *2 n.2. Thus, "no reasonable correctional officer could have concluded . . . [the conditions were] constitutionally permissible." *Id.* at *1 (citing *Hope*, 536 U.S. at 741) (explaining " 'a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question' ")).

Although the conditions in *Taylor* appear more extreme, Rico's allegations in the complaint, which must be taken as true, can be inferred as extreme. *See id.* at *1 (suggesting that that both "degree" and "duration" factor into the obviousness of a violation). Rico alleges he was deprived of sleep for over a year. As a result, he alleged that he suffered several health problems including an "abnormal heartbeat," "irregular breathing," "blurred vision," "dizzy spell[s]," "throbbing headaches," "anxiety," "trouble sleeping," and "difficulty concentrating."[5]

After defining the relevant right narrowly, the majority states that Guard One was "inherently noisy" and "the very construction" of the SHU "made difficult quietly conducting round-the-clock welfare checks that defendants were ordered by the *Coleman* court to perform." (Majority at 13). Ultimately, these facts may be established on summary judgment or at trial, but when reviewing a denial of a motion

---

[5] It is noteworthy that in *Taylor* the district court granted qualified immunity on summary judgment, not on a motion to dismiss. And the Supreme Court, in reversing the decision, held the issue of qualified immunity will require an "officer-by-officer analysis" on remand. *Taylor*, 2020 WL 6385693 at*1.

to dismiss, unless those facts are in the complaint or inferred in the plaintiff's favor, considering and relying on them on appeal is inappropriate.  Rico's allegations thus describe an obvious deprivation of a constitutional right, which is sufficient to survive a motion to dismiss.

The majority also rejects Rico's arguments that discovery is necessary to determine the amount of noise actually created by the manner in which Guard One was implemented, concluding that even if the guards "created extra noise by rushing to complete checks, this action was, at most, a reasonable mistake."[6]  (Majority at 19) (citing *Saucier v. Katz*, 533 U.S. 194, 205 (2001)).  And the majority offers new facts, that are not set forth in the complaint, that the initial requirement of checks twice per hour meant "the officers had to move quickly" and "reasonable officers might touch the metal disc more than once if they were not sure if the first touch had been recorded."  (Majority at 19.)  The majority adds, without support in the complaint, that maybe "it was better to rush checks . . . making more noise for a shorter period of time" instead of completing checks more slowly "making less noise for a longer period of time."  (Majority at 19–20).  Again, these facts may be born out on summary judgment or trial, but there is no support for them in the complaint.

Rather, Rico alleges it was the guard's desire to "rush[] through the pods" that created more noise than necessary.  This allegation cannot be inferred as a reasonable mistake by itself at this stage.  What is alleged is the guards "ran loudly up and down the metal stairs," hit the "buttons with more

---

[6] The guards were ordered by the court to engage in critical efforts to ensure prisoners could not commit suicide.  The problem here, however, was their implementation of those efforts.

force than necessary," and repeatedly missed hitting the buttons "making extra unnecessary noise."

IV

With regard to specific prison guards, I would affirm the denial of qualified immunity to Defendant Nelson because he worked as a floor officer during First Watch (the 10 p.m. to 6 a.m. shift).

I would also affirm the denial of qualified immunity as to Defendants Abernathy, Cuske, Marulli, and Parry. A prison official in a supervisory position may be liable under § 1983 if he "knowingly refus[es] to terminate a series of acts by others, which the supervisor knew or should have known would cause others to inflict a constitutional injury." *Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1085 (9th Cir. 2013) (quoting *Starr v. Baca*, 652 F.3d 1202, 1207–08 (9th Cir. 2011)). Rico filed five Form 22 complaints over the first four months of the implementation of the Guard One system, complaining the excessive noise from the Guard One checks was depriving him of sleep and harming his physical and mental health. Abernathy, Cuske, Marulli, and Parry responded to at least one Form 22 that specifically mentioned Rico's previous complaints and Defendants' failure to cure the noise problem. These defendants responded to Rico's repeated noise complaints and assured him "that they were looking into ways to reduce the noise." But, despite being put on notice the excessive noise related to the Guard One checks was causing Rico sleep deprivation, Rico alleged Defendants failed to adequately "train their staff to conduct the checks more quietly" and the conduct causing excessive noise continued. Therefore, "[a]t this early stage," they are liable

under § 1983.**[7]**  *Preschooler II v. Clark Cty. Sch. Bd. of Trustees*, 479 F.3d 1175, 1182 (9th Cir. 2007); *Lemire*, 726 F.3d at 1085.

---

**[7]** Marulli and Abernathy are responsible for supervising operations at the Pelican Bay SHU.